**UNITED STATES, Appellee,**

v.

**Private (E-1) Clifton JONES, 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, United States Army, Appellant.**

**CM 443520.**

U.S. Army Court of Military Review.

27 Feb. 1985.

Captain William T. Wilson, JAGC, and Captain David L. Carrier, JAGC, argued the cause for the appellant. With them on the brief were Colonel William G. Eckhardt, JAGC, Lieutenant Colonel R. Rex Brookshire II, JAGC, Lieutenant Colonel Arthur L. Hunt, JAGC, and Captain Stephen R. Dooley, JAGC.

Captain Andrew D. Stewart, JAGC, and Captain John F. Burnette, JAGC, argued the cause for the appellee. With them on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel John T. Edwards, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Major Thomas J. Leclair, JAGC, and Captain Robert C. Erickson, Jr., JAGC.

Before WOLD, NAUGHTON and COHEN Appellate Military Judges.

## OPINION OF THE COURT

WOLD, Senior Judge.

Appellant was charged with premeditated murder. A general court-martial composed of officer members found him guilty of involuntary manslaughter in violation of Article 119, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919 (1976). The convening authority approved the sentence to confinement at hard labor for seven years, forfeiture of $450.00 pay per month for seven years, and a bad-conduct discharge.

Appellant contends that he should have been provided a verbatim transcript of the Article 32, UCMJ, 10 U.S.C. § 832, hearing and that certain statements by appellant and the evidence derived therefrom should have been suppressed. Only the latter contention merits discussion.

## I. FACTS

Shortly after midnight on 3 June 1982, appellant appeared at the desk of the Charge of Quarters for his barracks on Fort Greeley, Alaska. Appellant's friend, Specialist Four Honacker, was on duty as Charge of Quarters. Appellant asked to

see his ex-girlfriend, Private First Class E. On receiving permission, appellant went to Private E's room and told her, "I'm sorry, your friend is dead, your friend is dead." (Private E had been seeing the victim of the homicide of which appellant was convicted.) Appellant then returned to Specialist Honacker and said he needed to speak with him.

Appellant told Honacker that he had stabbed someone—a man who drove a red car—near the post airfield; also that he had covered the body with pine branches. Appellant asked Honacker to drive him to the body to see if they could help the person, explaining that they would have to go off-post and take a particular highway to get to the body. As they started off-post, Honacker decided they should first see their supervisor, Sergeant Smalls. Specialist Honacker drove to Sergeant Smalls' home and spoke with Smalls while appellant waited in the vehicle. Honacker returned and told appellant that Smalls thought they should go to the military police. Appellant agreed.

Appellant and Honacker proceeded to the military police station, where Specialist Four Terry Sjostrom was on duty at the desk. Honacker told Specialist Sjostrom that a person was hurt out in the field. Sjostrom believed that someone had been injured during a field exercise since both appellant and Honacker were in field uniform. He asked Honacker who was injured, where the person was located, and how badly the person was injured. Specialist Honacker indicated that he could not provide the requested information but that appellant could. Sjostrom then asked appellant the same questions. Appellant responded, "[The person] is hurt real bad. I think he's dying." Sjostrom asked what was causing the person's death. Appellant answered, "I stabbed him." Upon hearing this, Sjostrom contacted both his patrol supervisor and the medical dispensary.

The corpsman who Sjostrom contacted at the medical dispensary wanted to know how badly the person was injured and the body areas where he had been stabbed. Sjostrom asked appellant where he had stabbed the individual. Appellant replied, "All over." Sjostrom relayed this information to the corpsman who then wanted to know where the person was located. Sjostrom asked appellant for this information. Appellant stated the person was in the woods by the airfield but that he would have to show them the location. Sjostrom told the corpsman to send an ambulance to the military police station so they could lead the ambulance to the injured person. At no point during this questioning of appellant did Sjostrom inform appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831.[1]

After the call to the dispensary, Sjostrom's supervisor, Sergeant Perry, arrived. Sjostrom told Perry that appellant had stabbed someone and was willing to take them to the victim. Sergeant Perry then read appellant his rights under Article 31. Appellant stated that he understood his rights and did not want to speak with a lawyer. Sergeant Perry asked appellant if he was willing to be questioned about the offense under investigation. Appellant said "No," and at the same time stood up and faced the door. Sergeant Perry thought appellant appeared anxious to do something. He interpreted appellant's actions to mean that appellant was ready to take them to the victim and asked appellant if he was willing to show them the victim's location. Appellant answered, "Yes, let's go." Appellant then led the military police

---

1. Article 31, UCMJ, 10 U.S.C. § 831 (1976), provides in pertinent part:

(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

\* \* \* \* \* \*

(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

and ambulance to the victim. The victim was dead. Appellant also showed the military police the location of the victim's car. The physical evidence thus obtained was an important part of the Government's case.

Appellant was returned to the military police station where he was readvised of his rights by a civilian policeman and Staff Sergeant Walsh, another military policeman. Neither of these individuals knew about appellant's prior indication to Perry that he did not wish to discuss the offense. Appellant waived his rights and answered their questions freely and responsively. These statements were also an important part of the Government's case.

At trial the military judge suppressed all evidence concerning the dialogue between Sjostrom and appellant subsequent to appellant's statement that he had stabbed a person, holding that this information was obtained in violation of Article 31. However, the military judge found that the rights advisement by Perry removed any taint which had been created by Sjostrom's questions and ruled that Perry's questions were lawful. All evidence discovered subsequent to Perry's advice to appellant was admitted. The military judge specifically found that appellant, in revealing the victim's location, had been motivated by contrition, a desire to assist the victim, a desire to lessen his culpability, or a combination of these factors.

Before this Court, appellant contends that the military judge should not have admitted any statements made subsequent to the rights advisement by Perry or any evidence derived therefrom. Appellant advances two arguments in support of this contention. First, he maintains that Sjostrom's earlier interrogation was unwarned and therefore tainted the statements and other evidence obtained later. Second, he argues that he had invoked his right to remain silent after Perry advised him of his rights and that Perry's subsequent inquir-

ies were therefore unlawful. We find both arguments to be without merit.

## II. UNWARNED INTERROGATION BY SJOSTROM

■ Appellant's first argument is based on the premise that after appellant admitted stabbing a person, Sjostrom had a duty to inform appellant of his rights under Article 31. Appellant argues that, absent this advice, not only were his answers to the questions subsequently asked by Sjostrom inadmissible but all subsequent statements and all derivative evidence were also inadmissible as the tainted product of this interrogation. Since we hold that Sjostrom had no duty to advise appellant of his rights under Article 31, the consequences which appellant urges necessarily fail.[2]

### A. *The Public Safety Exception*

The United States Supreme Court has recently recognized a "public safety" exception to the requirement that *Miranda*[3] warnings be given before a suspect's answers may be admitted into evidence. *New York v. Quarles,* — U.S. —, 104 S.Ct. 2626, 2629, 81 L.Ed.2d 550 (1984). This exception provides that the *Miranda* warning requirement will not be applied in "a situation in which police officers ask questions reasonably prompted by a concern for the public safety." 104 S.Ct. at 2632.

### B. *The Rescue Doctrine*

Prior to *Quarles,* the courts of California had recognized another exception to the prophylatic rule of *Miranda,* known as the "rescue doctrine." This doctrine provides that where the interrogation of a suspect is undertaken by the police for the paramount reason that information is being sought to save a life, the interrogating officers are justified in "not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of

---

2. This Court is not bound by the military judge's determination that appellant's statements to Sjostrom were obtained in violation of Article 31. *See United States v. Davis,* 6 M.J. 874, 878

n. 11 (A.C.M.R.1979), *pet. denied,* 8 M.J. 234 (C.M.A.1980).

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

counsel." *People v. Willis,* 104 Cal.App.3d 433, 163 Cal.Rptr. 718, 726 (Ct.App.1980) (defendant advised of rights, refused to waive, readvised and waived, court found emergency justified renewed interrogation) (citation omitted), *cert. denied,* 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980); *People v. Riddle,* 83 Cal.App.3d 563, 148 Cal.Rptr. 170 (1978) (advised of *Miranda* rights by one officer at hospital, three hours later questioned at jail by other officer with no *Miranda* warning, statements to second officer admitted under rescue doctrine), *cert. denied,* 440 U.S. 937, 99 S.Ct. 1283, 59 L.Ed.2d 496 (1979); *People v. Dean,* 39 Cal.App.3d 875, 114 Cal.Rptr. 555 (1974) (although no *Miranda* rights warning, spontaneous questioning by police about location of kidnap victim allowed).

In *People v. Riddle* the California Court of Appeals recognized that the decision in *Miranda* had not taken into account the possibility of emergency circumstances in which an interrogation would not be geared primarily toward criminal prosecution but instead toward saving a life. The concern of the United States Supreme Court in *Miranda* was that "the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against self-incrimination." *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). As a result of this concern, the United States Supreme Court developed *Miranda's* procedural safeguards to protect an accused's Fifth and Fourteenth Amendment rights during custodial interrogation. In *People v. Riddle* the California Court of Appeals concluded that the concerns underlying the *Miranda* rule arise only when there is an ongoing criminal investigation whose principal purpose and motive is to identify those responsible for a known crime and to obtain evidence for purposes of prosecution, but that the objectives of *Miranda* are not at issue when the primary purpose of police action is to save human life. 148 Cal.Rptr. at 175–76.

### C. *Applicability Under Military Law*

#### 1. Introduction

■ Appellant contests the applicability of these precedents to the case at bar. He points out that Article 31(b) and Military Rule of Evidence [hereinafter Rule] 305 [4] were created by authority of Congress and the President, respectively, and argues that both of them prescribe for military personnel rights which are broader than those secured by the Fifth Amendment. Next he argues that *Quarles* and the California cases merely modify *Miranda,* which in turn is merely an exercise of the Supreme Court's supervisory power designed to protect the narrower rights afforded to all individuals by the Fifth Amendment. Based on these premises, appellant argues that *Quarles* and the California cases are irrelevant to Article 31(b) and Rule 305. Appellant concludes by asserting that we lack authority, inherent or statutory, to interpret the Uniform Code of Military Justice in light of public policy considerations; that the "plain language" of Article 31(b)

---

**4.** Rule 305 provides in pertinent part:

\* \* \* \* \* \*

(b) *Definitions.* As used in this rule:

(1) *Persons subject to the Uniform Code of Military Justice.* A "person subject to the Uniform Code of Military Justice" includes a person acting as a knowing agent of a military unit or of a person subject to the Uniform Code of Military Justice.

(2) *Interrogation.* "Interrogation" includes any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning.

(c) *Warnings concerning the accusation, right to remain silent, and use of statements.* A person subject to the Uniform Code of Military Justice who is required to give warnings under Article 31 may not interrogate or request any statement from an accused or a person suspected of an offense without first:

(1) informing the accused or suspect of the nature of the accusation;

(2) advising the accused or suspect that the accused or suspect has the right to remain silent; and

(3) advising the accused or suspect that any statement made may be used as evidence against the accused or suspect in a trial by court-martial.

.

and Rule 305 forbids exceptions by interpretation; and that the United States Court of Military Appeals has already impliedly rejected the public safety and rescue doctrines as exceptions to Article 31(b) in such cases as *Cooke v. Orser*, 12 M.J. 335 (C.M. A.1982); *United States v. Lewis*, 12 M.J. 205 (C.M.A.1982); and *United States v. Dowell*, 10 M.J. 36 (C.M.A.1980).

The last three propositions require no extended discussion. First, we do not view *Cooke v. Orser, Lewis*, or *Dowell* as addressing the issues which confront us in the case at bar.[5] Second, neither do we view ourselves as some sort of sterile hybrid version of a civil law court, operating in a system from which judicial interpretation has been consciously removed—the Uniform Code of Military Justice is not a "code" in the continental sense of that term. For over 30 years, we and our predecessors, the boards of review, have been interpreting statutes, including the Uniform Code of Military Justice, in the same way as any other American court interprets statutes. Finally, we reject the proposition that the "plain language" of Article 31(b) and Rule 305 precludes interpretation. We are strongly committed to the "plain language" canon of construction, and to the principle of judicial restraint from which it springs. However, a series of cases from the United States Court of Military Appeals which interpret and limit Article 31(b) demonstrates that Article 31(b) is anything but "plain" in this sense[6] and, as noted below, the Drafter's Analysis of Rule 305 demonstrates that it was designed to be interpreted.[7]

This leads us to consideration of what we regard as the central issues raised by appellant's arguments, *i.e.*, whether the public safety exception in *Quarles* or the more limited rescue doctrine exception in the Cal-

ifornia cases is consistent with (a) the Fifth Amendment as applied in the armed services, (b) Article 31, and (c) Rule 305.

### 2. The Fifth Amendment

The public safety exception in *Quarles* is based on the results of a re-examination of the "doctrinal underpinnings" of *Miranda*, 104 S.Ct. at 2633 n. 7, during which the United States Supreme Court recapitulated the social calculus employed in *Miranda*. In *Miranda*, the Supreme Court engaged in a balancing test. On one side of the scales, they placed a benefit—a reduction in the coerciveness of custodial interrogations. On the other side, they placed a cost—a reduction in convictions of guilty suspects. The Court found the benefit greater than the cost, thus justifying the *Miranda* warnings rule. In *Quarles*, the Supreme Court added, on the cost side of the scales, the danger to society if threats to public safety were not promptly neutralized. With this addition, the Supreme Court found that the resulting combined costs outweighed the benefit to be gained by requiring rights warnings, thus justifying the public safety exception to the *Miranda* warnings rule.

There is, of course, no question that the Fifth Amendment and *Miranda* apply in the military. *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). What remains is the question whether the social calculus employed by the Supreme Court in *Quarles* dictates the same result in the particular circumstances which exist in the military. To answer this question, we must add to the *Miranda* equation not only the interests of public safety or the preservation of human life, but the coercive effect of the "subtle pressures which exist

---

5. On the other hand, *United States v. Fisher*, 44 C.M.R. 277 (C.M.A.1972), and cases cited therein are relevant and tend to support the position we adopt.

6. *E.g., United States v. Harden*, 18 M.J. 81 (C.M.A.1984); *United States v. Duga*, 10 M.J. 206 (C.M.A.1981); *United States v. Spivey*, 10 M.J. 7 (C.M.A.1980); *United States v. Davenport*, 9 M.J.

364 (C.M.A.1980); *United States v. Jones*, 6 M.J. 226 (C.M.A.1979); *United States v. Kirby*, 8 M.J. 8 (C.M.A.1979); *United States v. Dohle*, 1 M.J. 223 (C.M.A.1975); *United States v. Seay*, 1 M.J. 201 (C.M.A.1975).

7. Manual for Courts-Martial, United States, 1969 (Revised edition) [hereinafter MCM], App. 18, Rule 305 (C5, 1 June 1981).

in military society," [8] *i.e.*, the ethic of discipline and obedience and the pervasive presence of superior authority. In assessing the resulting balance we need not, in the case at bar, decide a question which may be dispositive in other cases, *i.e.*, whether the broad range of situations covered by the public safety doctrine in *Quarles* (rather than the much narrower range of situations and perhaps weightier values involved in the rescue doctrine of the California courts) would justify an exception to the warning requirement.

█ We are satisfied that the principles enunciated in *Quarles* support an exception to the *Miranda* warning rule in the military at least where (a) the possibility exists of saving human life or avoiding serious injury by rescuing the one in danger and (b) the situation is such that no course of action other than questioning of a suspect promises relief. Balancing the benefit of a reduction of the coerciveness of military interrogations against the cost of serious injury or the loss of human life, we find that the Fifth Amendment scales tilt decisively in favor of the latter even without considering the cost of a reduction in convictions of the guilty. We are also satisfied that the existence of these objective factors is sufficient to justify the exception without need for inquiry into the subjective motivation of the questioner. *Cf. Quarles*, 104 S.Ct. at 2632 ("The availability of the [public safety] exception ... does not depend upon the motivation of the individual officers involved.").

### 3. Article 31, UCMJ

The same analysis leads us to conclude that at least the rescue doctrine exception is consistent with Article 31.[9] This is because the objectives underlying Article 31(b) correspond almost exactly to the objectives of *Miranda*.[10] The only difference between the objectives of Article 31(b) and *Miranda* is that Article 31(b) is also designed to insulate a service member from the subtle pressure created by rank or duty to respond to an incriminating question. *See United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980); *United States v. Duga*, 10 M.J. 206, 210 (1981). As with *Miranda*, the underlying purpose of Article 31(b) is not offended when the occasion for unwarned questioning is to save a human life or avoid serious injury.

### 4. Military Rule of Evidence 305

As to Rule 305, we are satisfied that it was not the intention of the President that the provisions of the Rule determine under what circumstances rights warnings are required. First, Rule 102 provides that all the Rules are to be construed to "secure fairness" and promote the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." While Rule 102 does not constitute a license to substitute judicial prediliction for the specific dictates of the President, it does clearly establish a desire for flexibility and new approaches in the interpretation of the Rules. Second, the Drafter's Analysis [11]

---

**8.** *United States v. Armstrong*, 9 M.J. 374, 378 (C.M.A.1980). *See United States v. Lewis*, 12 M.J. 205 (C.M.A.1982); *United States v. Duga*, 10 M.J. 206 (C.M.A.1981).

**9.** The Government argues that Article 31(b) extends to service members only the rights secured by the Fifth Amendment as interpreted by the Supreme Court. *United States v. Lewis*, 12 M.J. 205 (C.M.A.1982) holds to the contrary. *See also* MCM, App. 22, Section III, para. 305.

**10.** *See United States v. Armstrong*, 9 M.J. 374 (CMA 1980), where the Court of Military Appeals adopts with minor modifications the Supreme Court's statement concerning the basis for *Miranda* in *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297

(1980) as the basis for Article 31(b). *See also United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), in which the United States Court of Military Appeals held the *Miranda* rules applicable to the military and briefly discussed the procedural dissimilarities between Article 31 and *Miranda*.

**11.** MCM, App. 22, Section III, para. 305(c). "The Rule refrains from specifying who must give ... warnings in view of the unsettled nature of the case law in the area. It was not the intent of the Committee to adopt any particular interpretation of Article 31(b) as to who must give warnings...."

reveals that Rule 305(c), which covers rights warnings, was designed to implement the rights defined in the Fifth Amendment and Article 31 as interpreted by the courts, not to codify any particular interpretation of either. This portion of the Rules, at least, is descriptive rather than prescriptive.[12]

### 5. Conclusion

■ The questions Specialist Sjostrom relayed from the corpsman at the dispensary to appellant were the only available means of obtaining information necessary for the provision of adequate medical services to a seriously injured person. As long as the victim remained unlocated and unattended, his life potentially hung in the balance. We believe that under these circumstances compliance with Article 31(b) and *Miranda* was excused by the rescue doctrine and that Specialist Sjostrom was under no obligation to recite a rights advisement before asking appellant where the injured party was located and where and how appellant had stabbed the victim. We therefore hold, contrary to the military judge's ruling, that appellant's responses to Sjostrom's questions were admissible and did not taint any subsequent evidence.[13]

### III. QUESTIONING BY PERRY

■ We find appellant's second argument—that he had invoked his right to remain silent after which that right was violated by Sergeant Perry's questions—also to be without merit. After being advised of his rights by Perry, appellant did not unequivocally invoke his right to remain silent. At the same time appellant said he did not want to make a statement, he stood and faced the door. Appellant's words, coupled with his actions at the time and previously, are subject to a number of interpretations. The most compelling and logical interpretation is that appellant did not want to take the time to make a statement but rather wanted to get aid to the victim. Appellant had already demonstrated his concern about assisting the victim. He initiated the contact with the police, volunteered the information that a person was injured, and expressed concern that aid be rendered. We hold that Perry's attempt to clarify appellant's desires by asking him if he was willing to take the authorities to the victim was not improper and did not infringe upon appellant's rights. *See Nelson v. McCarthy*, 637 F.2d 1291 (9th Cir. 1980), *cert. denied*, 451 U.S. 940, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981); *Nash v. Estelle*, 597 F.2d 513 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979); *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir.) (*en banc*), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); *United*

---

**12.** Even if we were to conclude that the President intended to prescribe substantive law in Rule 305, we would have to be convinced that he had the authority to do so. In Article 36, UCMJ, 10 U.S.C. § 836, Congress appears to have delegated to the President its authority to prescribe evidentiary and procedural, but not substantive, rules. The other possible source of Presidential authority to prescribe substantive rules is Clause 1, Section 2, Article II, of the Constitution, which makes the President the Commander-in-Chief. Whether this clause includes a Constitutional grant of legislative authority is questionable in light of Clause 14, Section 8, Article I, in which Congress is given the authority, "To make Rules for the Government and Regulation of the land and naval Forces." *See generally, United States v. Ellison*, 13 M.J. 90, 91 (C.M.A.1982); *United States v. Redding*, 11 M.J. 100, 110 (C.M.A.1981); *United States v. Ezell*, 6 M.J. 307, 316–317 (C.M.A.1979);

*United States v. Kelley*, 7 U.S.C.M.A. 584, 23 C.M.R. 48, 52 (1957).

**13.** Our decision presupposes that Article 31(b) applies to this case. In *United States v. Duga*, 10 M.J. 206, 219 (C.M.A.1981), the Court set forth two prerequisites which must be met before the requirements of Article 31(b) are triggered: (1) the questioner subject to the Code must have been acting in an official capacity in his inquiry as opposed to having only a personal motivation for the questions; and (2) the person questioned must have perceived that the inquiry involved more than a casual conversation. Although an argument can be made that Sjostrom was not acting in an official capacity while he was questioning appellant, we believe such an argument to be artificial. Once appellant admitted to Sjostrom that he had stabbed an individual, the provisions of Article 31(b) were triggered. Only the rescue doctrine excused compliance.

*States v. Stark*, 19 M.J. 519, 525 (A.C.M.R. 1984).

The record further reflects that appellant understood his rights. He acknowledged to Perry and voiced to others a desire to go to the victim. These facts convince us that appellant knowingly and voluntarily waived his rights. Therefore, appellant's subsequent statements and the evidence derived from his subsequent acts were admissible at trial.[14]

We have also considered the matters personally raised by appellant and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge NAUGHTON and Judge COHEN concur.[15]

---

**14.** The record of trial indicates the evidence at issue would have been discovered in the due course of the investigation of the offense. However, since we have determined that appellant's statements and acts were not tainted by the questions posed by Sjostrom or Perry, we have no occasion to consider application of the inevitable discovery rule to this case. *See generally Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Kozak*, 12 M.J. 389 (C.M.A.1982); *United States v. Carrubba*, 19 M.J. 896 (A.C.M.R.1985).

